UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

---

**VERNON SMITH ET AL**  CASE NO. 1:65-cv-11577

-vs-  JUDGE DRELL

**SCHOOL BOARD OF CONCORDIA PARISH**  MAGISTRATE JUDGE PEREZ-MONTES

---

### MEMORANDUM RULING

Before the court are two motions filed by Intervenor Delta Charter Group ("Delta"): (1) a motion for dismissal from the case, (Doc. 274), and (2) a motion to discontinue the use of race in its process of enrolling students. (Doc. 286). Defendant Concordia Parish School Board ("Concordia" or the "District") and Plaintiff-Intervenor United States (the "Government") filed oppositions to Delta's motion to discontinue the use of race in its enrollment process. (Docs. 293, 294). Delta filed a single reply to both Concordia and the Government's oppositions. (Doc. 297). For the reasons below, Delta's motion for dismissal from the case will be **DENIED AS MOOT**, and its motion to discontinue the use of race in its enrollment processes will be **DENIED**, but with modifications to existing orders concerning enrollment at Delta Charter School.

**I.    RELEVANT BACKGROUND**

The facts surrounding Delta's latest effort to challenge the role of race in its admissions process do not stretch back to the initiation of this lawsuit in 1965. As such, we need only begin our recitation at the founding of Delta Charter School in 2012. Some of the following is undoubtedly repetitive but necessary to confirm the context of these rulings.

On October 4, 2012, Delta moved this court for authorization to open the Delta Charter School for Math, Science, and Technology ("Delta Charter School" or "DCS") in Ferriday,

1

Louisiana—a town located within Concordia Parish. In its motion, Delta acknowledged that if authorized to open DCS, a Type 2 charter school[1], it would operate subject to the existing desegregation plan governing Concordia Parish schools. See also La. R.S. 17:3991(C)(3) ("A charter school shall . . . [b]e subject to any court-ordered desegregation plan in effect for the city or parish school system."). It asserted that DCS's presence would "not have a negative impact on [the] Concordia Parish School District's ability to comply with its desegregation plan." (Doc. 41). Delta acknowledged this court's "authority to render a decision as to the authority to open any new public school or charter school in Concordia Parish, Louisiana." (Doc. 41).

In that same motion, Delta proposed an admissions lottery that considered race as necessary to comply with the court's existing desegregation orders: "[T]o comply with this Court's desegregation decree, DCS has granted in its lottery system a preference for minority students up to 40% of the student population to assure that particular minimum minority participation in DCS."[2] (Doc. 41-1). If Delta failed to achieve the 40% "in a given class," Delta asserted it would admit minority students "on the basis of the highest lottery number assigned . . . until the 40% minority student percentage [was] achieved." (Doc. 41-2). Delta chose 40% because that percentage "reflect[ed] the demographics of school-aged children around Concordia Parish." (Doc. 41-1). Following negotiations, the parties reached an agreement and jointly moved this court to approve a consent order, which this court adopted on January 4, 2013 ("2013 Consent Order"). (Doc. 60).

---

[1] A Type 2 charter school is a "public school," La. R.S. 17:3973(2)(a), and "pupils who reside in the state [are] eligible to attend [the school] . . . ." La. R.S. 17:3973(2)(b)(ii).
[2] Delta also stated that it was employing this lottery "[t]o ensure that the Delta Charter School is a racially integrated school." (Doc. 41).

2

In the 2013 Consent Order, Delta expressly agreed that "it is governed by and that it will comply with the desegregation obligations mandated by this case" and that "it will take no action that will impede [Concordia's] ability to fulfill its obligations." (Doc. 60). The 2013 Consent Order also reflects the parties' agreement that Delta would conduct an admissions lottery that considered race. The 2013 Consent Order provides in pertinent part:

> Delta Charter Group will amend its at-risk[3] and final lotteries to incorporate a preference for a student who seeks to enroll at Delta Charter School from a Concordia Parish school where his/her race is overrepresented compared to the overall racial demographics of the [school d]istrict.

(Doc. 60). The parties also agreed that in the event Delta's student enrollment did not "reflect the racial demographics" of Concordia, such that in any "school year the percentage of [B]lack student enrollment in Delta Charter School is 10% or more below the [B]lack student enrollment in [the school district], Delta Charter Group will analyze the causes of this enrollment rate, propose how to modify the enrollment rate, and submit the analysis and proposal to the Court and the parties by July 15 of each year for the upcoming school year." (Doc. 60).

During the 2013-2014 school year—Delta's first year of operation—only 15.2% of Delta's 323 accepted students were Black, compared with the 52.2% Black student enrollment across Concordia Parish schools. (Docs. 64, 85-1). Concordia filed a motion in June 2014, asserting that Delta had violated the 2013 Consent Order and had thereby interfered with its ability to comply with its own desegregation obligations. (Doc. 68). Following a three-day hearing, this court ruled

---

[3] The "at-risk" language appeared in Louisiana Revised Statutes 17:3973(1) at the time Delta crafted its admissions policy. That language was repealed by in 2017 by Acts 2017, No. 136, § 2 and the term "economic[ally] disadvantage[d]" became controlling with respect to those populations of students originally designated as "at-risk." See La. R.S. 17:3882(4); 2017 La. Sess. Law. Serv. Act No.136 (H.B. No. 130) (West) (repealing the "at-risk" definition in La. R.S. 17:3973(1) relative to students and providing that economically disadvantaged students to be included as a factor in determining enrollment requirements of at-risk students in certain charter schools).

3

that Delta had not complied with the 2013 Consent Order and had "not even come close" to reflecting Concordia's racial demographics—a requirement that "was not an estimate, [and] that was not optional." (Doc. 171) ("It is obvious to me that the school is not in compliance with the court order."). We found that Delta's violation "seriously impacted the Concordia Parish School Board's desegregation efforts." (Doc. 172).

On June 8, 2017, we issued a memorandum ruling ("2017 Ruling") concluding that Delta had "deliberate[ly]" violated the terms of the 2013 Consent Order while pursuing its own agenda: "Delta has clearly not complied with the consent order to say the least, and it has attempted to move rapidly forward with its own agenda while only winking at its court-ordered obligations. This will stop." (Doc. 173). This court retained jurisdiction and had "authority to issue and enforce ancillary orders and judgments necessary for the continued oversight of Concordia's desegregation efforts" and "enforcement of its prior desegregation order." (Doc. 173). In 2018, the Fifth Circuit affirmed this court's finding that Delta had not complied with the 2013 Consent Order, as well as reaffirming this court's authority to impose further relief to enforce the decree. Smith v. Sch. Bd. of Concordia Par., 906 F.3d 327, 330, 335-36 (5th Cir. 2018) ("[C]onsiderable evidence showed that Delta had violated the consent decree and 'substantially impacted Concordia's compliance with ongoing desegregation orders.'").

The 2017 Ruling required certain corrective measures. For example, we limited the number of students DCS could accept from Concordia Parish schools to 350, appointed Dr. Percy Bates as Special Master, and, upon suggestion of Dr. Bates, instructed Delta to create a diversity committee aimed at increasing minority student enrollment. (Doc. 173). Dr. Bates worked closely with the diversity committee to ensure that Delta: (1) created a "minority student recruitment plan;" (2) created a "properly documented waiting list for admission to the school and a fair and impartial

lottery process for enrollment;" (3) fashioned a plan to eliminate "disparate treatment and disparate impact on minority students" regarding (a) student discipline, (b) student participation in extracurricular activities, and (c) transportation services for students; (4) "otherwise complie[d] with the provisions of [the 2013 Consent Order]." (Docs. 197, 173).

Thereafter, the parties, under the guidance of Dr. Bates, developed a "reasonable and sound enrollment process" to "advance[] the goals of desegregation at Delta Charter School" and jointly submitted that enrollment process as part of a proposed consent order in July 2018. (Doc. 219). This court granted the motion and entered the order ("2018 Consent Order"), concluding the proposed enrollment process was "reasonably designed to advance desegregation." (Docs. 220, 221, 223). The 2018 Consent Order became effective beginning in the 2018-2019 school year and remains in effect "until further order of this court." (Docs. 200, 223, 222-1).

Delta adopted the 2018 Consent Order "[t]o comply with Louisiana law regarding charter school admissions[] and applicable Court Orders in the school desegregation case." (Doc. 222-1). The 2018 Consent Order outlines the steps Delta will take to comply with the 2013 Consent Order's requirement that Delta's student enrollment "reflect the racial demographics of [the] Concordia Parish School District" by setting forth various requirements for Delta's lottery and admissions procedures. (Doc. 60).

The 2018 Consent Order assigns the highest lottery preference to Black students and lower preferences to children of employees and siblings of current students. (Doc. 222-1). The enrollment process requires Delta to admit Black students and students of other races in kindergarten on a 1:1 basis up to 30 total students and allows Delta to enroll an additional six Black kindergarteners beyond the 1:1 enrollment, for a maximum kindergarten enrollment of 36 students. (Doc. 222-1). For grades 1-12, Delta is required to enroll Black students first "[t]o meet [Delta's]

obligation to enroll a student body that will reflect the racial demographics of Concordia, such that the percentage of Black students will be within 10% of the [B]lack student enrollment in the school district." (Doc. 222-1). Following that initial round of admissions offers, Delta may extend offers of admission to students of other races, subject to the preexisting cap of 350 students from Concordia Parish and an overall cap of 500 students. (Doc. 222-1). The 2018 Consent Order also requires Delta to seek approval from the Special Master and the court before offering admission to new students. (Doc. 222-1).

After the implementation of the 2018 Consent Order, with the close oversight of the Special Master, DCS's overall racial demographics improved. In the 2017-2018 school year, just before the 2018 Consent Order was implemented, DCS's total student enrollment was 16% Black and 81% White, which fell well below Concordia's demographics of 51% Black and 46.2% White. (Docs. 184, 209-1). During the 2020-2021 school year, for the first time following the implementation of the 2018 Consent Order, DCS's Black student enrollment increased to be within 10% of the racial demographics of the school district. That year, Delta Charter's total student enrollment was 40.5% Black and 58.6% White. (Doc. 240).

On May 6, 2022, Delta moved for dismissal from this case. (Doc. 274). The Government requested discovery to address the factual issues raised in Delta's motion. (Doc. 277). During the status conference on May 24, 2022, Delta offered to limit the scope of its motion, and this court indicated that it would permit Delta to move for more limited relief. (Doc. 284). On June 3, 2022, Delta moved this court to "discontinue the use of race a factor in [its] enrollment process and to relieve Delta of any obligation to achieve a targeted racial quota or percentage." (Doc. 286).

II.    **LAW & ANALYSIS**

   A. **Delta's motion to dismiss is moot.**

Delta moved for dismissal from this case on May 6, 2022. (Doc. 274). During the status conference on May 24, 2022, however, Delta offered to limit its motion to the single legal inquiry at issue here—the discontinuance of race in its admissions process and to relieve it of any duty to achieve certain demographics within the student population. (Doc. 284). Because Delta agreed to file a different motion to narrow its requested relief, its motion for dismissal as an intervenor in the instant litigation, (Doc. 274), is **DENIED AS MOOT**. We now turn to the merits of Delta's controlling motion to determine the propriety of using race in its admissions policies.

   B. **Delta jointly drafted and bargained for the provisions set out in the 2018 Consent Order, and compliance with its terms is generally compulsory absent a showing of a significant change in circumstances that would warrant revision.**

This court construes Delta's controlling motion to discontinue the consideration of race in its enrollment process, (Doc. 286), as a request to change the way it admits and enrolls students to Delta Charter School. In other words, Delta's motion amounts to a request to modify the 2018 Consent Order it voluntarily entered with the Concordia Parish School Board and the Government to ensure its operation of Delta Charter School would not undermine Concordia's desegregation efforts.[4]

The 2018 Consent Order, like any consent decree, is a judgment and may be modified for any of the reasons set forth in Federal Rule of Civil Procedure 60(b). Modification may be

---

[4] The Government's memorandum in opposition to Delta's motion correctly notes that Delta failed to cite "the law or procedural rule that would justify its requested relief." (Doc. 293) (internal citations omitted). While this is true, Fifth Circuit and Supreme Court precedent and Federal Rule of Civil Procedure 60(b) vest this court with the power to undertake a flexible approach when modification requests to consent decrees are before the court. Therefore, we proceed in our consideration with the standard set forth in Federal Rule of Civil Procedure 60(b).

7

appropriate when "applying [the consent decree] prospectively is no longer equitable" or for "any other reason that justifies relief." FED. R. CIV. P. 60(b)(5)-(6); see Rufo v. Inmates of Suffolk Cnty. Jail, 502 U.S. 367, 378 (1992). Consent decrees are neither static nor do they exist in a vacuum. These judgments must be responsive and adaptive to conform to the needs of those party to the agreement. As such, "[d]istrict courts must take a flexible approach to motions to modify consent decrees and motions to modify or vacate institutional reform decrees." League of United Latin Amer. Citizens, Dist. 19 v. City of Boerne, 659 F.3d 421, 437 (5th Cir. 2011) ("LULAC") (internal citation omitted). "Flexibility is 'often essential to achieving the goals of reform litigation.'" Id. (quoting Rufo, 502 U.S. at 381). Additionally, district courts have inherent equitable power to modify their own decrees, including consent decrees, to accomplish the intended result. See LULAC, 659 F.3d at 436.

To determine whether the 2018 Consent Order should be amended, we must employ a two-prong test announced by the Supreme Court in Rufo. First, the "party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree." Rufo, 502 U.S. at 383. That change may be with respect to the facts of the case or a change in the law. See id. at 384. For example, the "[m]odification of a consent decree may be warranted when changed factual conditions make compliance with the decree substantially more onerous," "when a decree proves to be unworkable because of unforeseen obstacles," or "when enforcement of the decree without modification would be detrimental to the public interest." Id. In some limited cases, modification may be warranted absent factual or legal changes "other than recognition of the fact that the initial remedy ha[s] failed." LULAC, 659 F.3d at 438 (citing United States v. United Shoe Mach. Corp., 391 U.S. 244, 252 (1968)). Again, courts should

take a flexible approach when deciding modification requests. See id. (citing Rufo, 502 U.S. at 379).

Once the movant has established that there has been a change in circumstances or that the decree has failed to achieve its intended result, the second step is for the court to "consider whether the proposed modification is suitably tailored" to the issue the change is intended to address. Rufo, 502 U.S. at 383.

> 1. *No significant change in either the underlying facts or in the law warrants this court to modify substantively the 2018 Consent Order.*

In this case, we must first determine whether Delta has met its burden of establishing that there has been a change in factual or legal circumstances or that the 2018 Consent Order is failing to achieve its intended result of effectively ensuring Delta's operation of Delta Charter School does not undermine Concordia's desegregation efforts. Delta alleges no factual changes in its operations; it only advances an argument based on a decision handed down by the Supreme Court in 2007. (Doc. 287). Delta's reliance on a fifteen-year-old plurality opinion in Parents Involved in Community Schools v. Seattle School District No. 1, 551 U.S. 701 (2007), certainly fails to rise to the kind of significant legal change the Supreme Court contemplated in Rufo.[5] What remains then

---

[5] Delta's position that the Parents Involved decision makes the enrollment process articulated in the 2018 Consent Order unconstitutional is without merit. The Fifth Circuit has held that district courts (and this court in particular) have remedial authority to enforce desegregation obligations incorporated into consent decrees against a party that entered that decree. Concordia Par., 906 F.3d at 334. One of the remedial measures undertaken was implementing Delta's race-conscious enrollment process to ensure, most importantly, that the existence of DCS would not undermine Concordia's ongoing desegregation obligations. (Docs. 220, 221, 223). The historical exposition of racial balancing in the concurrence to the Fifth Circuit's majority opinion in Concordia Parish is not applicable here. Concordia remains under an active desegregation order, and Louisiana law requires charter schools seeking authorization to operate in a non-unitary school district to obligate themselves to whatever court orders the district is subject to. See Concordia Par., 906 F.3d at 331 ("While a desegregation order remains effective, the district court has a 'constitutional duty' to enforce the order and to ensure that the school district 'take[s] all steps necessary to eliminate the vestiges of the unconstitutional *de jure* system.'") (quoting Hull v. Quitman Cnty. Bd. of Educ., 1

is determining whether the 2018 Consent Order fails to achieve its intended result. Neither this court nor the Fifth Circuit finds that the 2018 Consent Order impedes Delta's efforts to operate a school within Concordia Parish or that the consent order undermines Concordia's desegregation efforts. Therefore, we do not find that Delta has satisfied the first element of the Rufo test.

> 2. *There is no need to consider whether Delta's proposal is suitably tailored to its operation of Delta Charter School.*

Because Delta failed to show a significant change in circumstances or that the 2018 Consent Order failed to achieve its intended result, we need not consider whether Delta's requested relief is suitably tailored to operating Delta Charter School. It follows that Delta's failure to satisfy the Rufo test means that modifying the consent decree's language with respect to Delta's enrollment procedures is not appropriate under Rule 60(b) of the Federal Rules of Civil Procedure. Accordingly, we will **DENY** the "Motion of Delta Charter Group to Discontinue the Use of Race in Its Enrollment Process," (Doc. 286).

### C. Equity demands that Delta be afforded an opportunity to demonstrate its ability to continue compliance with the 2018 Consent Order.

While we do not find it appropriate to release Delta from its compliance obligations to the 2018 Consent Order, we cannot turn a blind eye to the significant progress and success it has achieved in the composition of its student population. Latest data presented to the court supports the observation that the changes Delta made in its recruitment and enrollment processes have positively impacted its ability to comport with the 2018 Consent Order. Upon consultation with

---

F.3d 1450, 1453 (5th Cir. 1993); Freeman v. Pitts, 502 U.S. 467, 485 (1992)). It should also go without saying, but for the sake of clarity we will: The concurrence in Concordia Parish is not part of the majority's opinion, and the views or rationales expressed therein related to the holdings of that decision are not binding on this court. Finally, Delta attempted to rely on Parents Involved in its previous unsuccessful attempt on appeal to modify the 2013 Consent Order and advanced similar arguments proffered in the controlling motion, meaning the decision hardly constitutes a change in the law warranting modification of the 2018 Consent Order. (Doc. 145-1).

Special Master Dr. Bates, this court finds it appropriate to modify our existing order to allow the enrollment cap to be raised from 350 to 450 for students domiciled in Concordia Parish. Delta may elect to admit new students in accordance with this adjustment beginning with the spring semester of the 2022-2023 academic year (or later as appropriate), and this upward adjustment will remain in place until otherwise modified by this court. We deem such an increase to be suitably tailored to DCS's desire to expand its footprint within the Concordia Parish community without harming Concordia's ongoing desegregation obligations. See Rufo, 502 U.S. at 383. The forthcoming order, however, will not disturb any other provisions in the 2018 Consent Order, including Delta's comportment with the 1:1 ratio that enrolls Black and non-Black (*i.e.*, White and others) within ± 10% of the Black student population in Concordia Parish schools. (Docs. 220, 221, 223).

### III.   CONCLUSION

Delta has made considerable and favorable strides in its compliance with the 2018 Consent Order, and we hope such compliance continues amid the new grants afforded in the accompanying order. Diversity of background, experience, and thought are all essential to vibrant learning communities, but especially within primary and secondary schools. This statement captures the sentiment of the Warren Court when it held states' operation of "separate-but-equal" public schools to be unconstitutional. See generally, Brown v. Bd. of Educ. of Topeka, Shawnee Cnty., Kan., 347 U.S. 483 (1954). In 1970, this court became tasked with the remediation of the separate-and-unequal school systems, and the implementation and enforcement of the 2018 Consent Order seeks to do just that. Part of that remediation now includes Delta's full compliance with the 2018 Consent Order.

We again emphasize Delta's free and voluntary participation as an intervenor in the instant litigation. Delta represented to the court that it fully understood the contours of Concordia Parish's

educational landscape when it sought authorization to operate DCS back in 2012. Had Delta wanted to abstain from the directives set forth in the 2018 Consent Order, including its current enrollment process, its organizers were free to open and operate as a private school. But because Delta chose to open a public charter school, Delta must follow Louisiana law and comply with desegregation orders active in the school district. It is also obligated by federal law to adhere to the consent decree it entered. For these reasons, Intervenor's "Motion of Delta Charter Group for Dismissal from Case," (Doc. 274), is hereby **DENIED AS MOOT** since an alternate motion was deemed controlling, and the "Motion of Delta Charter Group to Discontinue the Use of Race in Enrollment Process," (Doc. 286), is hereby **DENIED**. An order reflecting the adjustments in DCS's enrollment cap as it relates to the number of students who reside in Concordia Parish will be issued in conjunction with this ruling.

THUS DONE AND SIGNED at Alexandria, Louisiana this ___ day of December 2022.

                                                DEE D. DRELL, SENIOR JUDGE
                                                UNITED STATES DISTRICT COURT